UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


MARK GOETZ                              )
                                       )
        *Plaintiff*,                    )
v.                                     )        No. 1:07-cv-303
                                       )        *Edgar*
GREATER GEORGIA LIFE                   )
INSURANCE COMPANY, UNICARE             )
LIFE AND HEALTH INSURANCE              )
COMPANY, WELLPOINT HEALTH              )
NETWORKS, INC. and DISABILITY          )
REINSURANCE MANAGEMENT                 )
SERVICES, INC.                         )
                                       )
        *Defendants*.                   )


**MEMORANDUM**


        Plaintiff Mark Goetz originally brought his complaint in the Circuit Court of Hamilton

County, Tennessee seeking damages for breach of contract, bad faith failure to pay claims, and

violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 and 47-

18-109.  [Court Doc. No. 1-1, Complaint].  Defendants Greater Georgia Life Insurance Co.

("GGL"), Unicare Life and Health Insurance Company ("Unicare"), Wellpoint Health Networks,

Inc. ("Wellpoint"), and Disability Reinsurance Management Services, Inc. ("DRMS")

(collectively "Defendants") removed the case to this court asserting that Plaintiff's claims were

pre-empted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et

seq. ("ERISA").

        Plaintiff moved to remand this action to state court for lack of jurisdiction on the grounds

that his claims were excluded from ERISA because the policy at issue was a "church plan" that is excluded from ERISA's coverage pursuant to 29 U.S.C. § 1002(33). [Court Doc. No. 5]. This court denied Plaintiff's motion and determined that the insurance policy at issue was not excluded from ERISA. [Court Doc. No. 14].

The parties have now moved for judgment on the pleadings based on the administrative record filed with the court. [Court Doc. Nos. 29, 31]. This court has reviewed the administrative record, the arguments of the parties, and the applicable law and has determined that Plaintiff's motion will be **GRANTED** and Defendants' motion will be **DENIED**.

## I.     Background

Plaintiff Mark Goetz is the former Chief Operating Officer for Precept Ministries of Reach Out, Inc., ("Precept Ministries") a non-profit ministry organization. On June 17, 2004 the Human Resources Director of Precept Ministries completed an application for group long term disability ("LTD") insurance with GGL. Administrative Record ("A.R."), pp. 1785-1788.[1] The application provided for a benefit of 66 2/3% of basic monthly earnings with a maximum monthly benefit of $5,000.00. The application also indicates a checked box next to the words "3/12 Exclusion" underneath a section labeled "Pre-existing Conditions." *Id.* at p. 1786. The application included an eligible class of all active full-time employees. *Id.* at p. 1788. The effective date of the policy was July 1, 2004. A.R., p. 1790.

---

[1] The court has reviewed the voluminous administrative record of over 2,000 pages filed by the parties. Unfortunately, the materials were not organized in any way and consisted of, in some cases, numerous duplicates. Therefore, the court will cite to only one page that contains each of the various key documents rather than attempting to point out the location of all the duplicates of each key document in the administrative record.

-2-

## A.    Pertinent Provisions of the LTD Policy

July 1, 2004 was the effective date of GGL's LTD policy number GA0960 (the

"Policy").  *See* A.R., p. 1789.  A sheet summarizing the Policy states that GGL would be referred

to as "the Company."  A.R., p. 1789.  It is unclear from the record if this sheet is intended to be

incorporated as a part of the Policy itself.  The multiple duplicate copies of the Policy in the

record appear to be very generic LTD policies without reference to Precept Ministries

specifically.  *See e.g.* A.R., pp. 1816-1848.  The term "Company" is not defined in the actual

Policy.  The Schedule of Insurance indicates that a "Pre-existing Condition Limitation" does

apply.  A.R., p. 1798-1800.  The Policy contains a provision for exclusion of pre-existing

conditions.  *See* A.R., p. 170.  The exclusion states:

> 1.     If the 3/12 Exclusion was chosen in box 18 of the
> application, then the following applies to this policy:
> This policy will not cover any disability:
> a.     caused by, contributed to by, or resulting from a pre-
> existing condition; and
> b.     which begins in the first 12 months after an insured's
> effective date.
> A "pre-existing condition" means a sickness or injury for which
> the insured received medical treatment, consultation, care or
> services including diagnostic measures, or had taken prescribed
> drugs or medicines in the three months prior to the insured's
> effective date.

A.R., p. 170.  The Policy defines "injury" as a "bodily injury resulting directly from an accident

and independently of all other causes.  The injury must occur and disability must begin while the

employee is insured under this policy."  A.R., p. 160.  The Policy defines "sickness" as "illness

or disease."  A.R., p. 161.  The Policy does not define the terms "caused by, contributed to by, or

resulting from."

The Policy states that "[t]he Company will provide a certificate to the policyholder for

delivery to each insured.  If the terms of a certificate and this policy differ, this policy will govern."  A.R., p. 1843.  The Policy further asserts that "[i]n making any benefits determination under the Policy, the Insurance Company shall have the discretionary authority both to determine an individual's eligibility for benefits and to construe the terms of the Policy."  A.R., p. 1846.

The "Schedule of Benefits" supplied to Precept Ministries by GGL indicate a section pertaining to Policy provisions relating to "Pre-existing Conditions."  *See* A.R., p. 1346.  Underneath this section, a check mark is indicated next to a line that states, "Other <u>NONE</u>."  *Id.*

## B. Plaintiff's Disability

On May 28, 2006 emergency workers brought Plaintiff Mark Goetz to the Erlanger Hospital emergency room after Goetz "fell approximately four times and struck his head."  A.R., p. 305.  His inpatient medical records demonstrate that he had a blood alcohol content upon admission to the hospital of 205 mg. or .20.  A.R., pp. 254-55.  The Discharge Summary associated with his discharge over two weeks later indicated a final diagnosis of "subdural hemorrhage."  *Id.*  The "Hospital Course" notes in the Discharge Summary state in part:

> This 47-year-old male was brought to the ER after he fell approximately four times and struck his head.  The patient also apparently had some seizure activity. He was intubated in the ER, and a CT scan demonstrated an acute left subdural hematoma.  We were called, and he was taken emergently to the OR for a craniotomy and evacuation of the hematoma.  He was left intubated and taken to the Intensive Care Unit on the ventilator.
>
> Dr. Robert Maxwell from Critical Care Surgery was consulted to help follow the patient.  He was placed on fosphenytoin and Rocephin.  Ativan was ordered, but was later started on alcohol withdrawal protocol.  He apparently does have a history of alcohol abuse.  Dr. Rankine from Neurology saw him as he also possibly had a stroke in the past and had been on anticoagulation for that. . . . The patient did have improvement in his mental status and was more alert prior to discharge.  He was evaluated for placement in rehab and following conversations with his insurance carrier, he was accepted for rehab at Siskin and was able to transfer there on June 15, 2006.

A.R., pp. 305-06.  The parties do not appear to dispute that the subdural hematoma suffered by

Mr. Goetz on May 28, 2006 has left him disabled to the extent that he cannot perform the job

functions of his prior job at this current time.  Mr. Goetz's medical records indicate that he

received physical rehabilitation services from Siskin Hospital from June 15, 2006 until July 17,

2006.  A.R., p. 329.  The Discharge Summary from Siskin included a note that "[t]here were no

seizure activities or other signs of alcohol withdrawal while he was a patent [sic] here."  A.R., p.

329.  The history and physical records from Siskin Hospital indicate that Mr. Goetz has

> a history of alcohol use that was unknown by his family, and stopped drinking
> alcohol a year ago.  Two weeks after he quit, he had an episode of DT's with
> seizure.  He was seen and treated for this and recovered, and went through detox.
> He was not known to be drinking again until the day he presented to Erlanger
> Medical Center when he was found to have alcohol in his system at the time of
> the incident.

A.R., p. 331.

Following his discharge from Siskin Hospital, it appears that Mr. Goetz received

additional post acute rehabilitation at Sumner Regional Medical Center in Gallatin, TN from July

17, 2006 to August 11, 2006.  A.R., p. 471-525.  The admission records indicate that Mr. Goetz's

past medical history was "[s]ignificant for ethanol abuse, discontinued in 2005 with

rehabilitation following delirium tremors.  He also has a seizure disorder primarily when he is

withdrawing from alcohol. . . ."  A.R., p. 471.

### C.    Records Pertaining to Pre-existing Condition Time Period

Prior medical records during the pre-existing condition time period pertaining to Mr.

Goetz demonstrate that on May 2, 2006 he visited  Dr. Eugene Ryan.  A.R., 312-313.  The

records from that visit indicate:

> Mr. Mark Goetz is a 47-year-old white male who presents today for reevaluation of seizure disorder. The patient is taking Dilantin 2 in the morning and 1 in the evening time. He does states [sic] that it makes him somnolent, but he denies any recurrent seizure activity. He denies any chest pain or chest tightness. No shortness of breath. No hematemesis, hemoptysis, hematochezia or melena. No epigastric pain, constipation or diarrhea. No further TLA's. No seizures. . . . He does have a history of alcohol abuse and requested an alcohol level be done on 3/23/06 and it was positive at 42. This was sent to the patient for the patient to decide if he wanted to send it to work or not.

A.R., p. 312. Underneath the "Social History" portion of the medical record, Dr. Ryan noted,

"[t]he patient states he has stopped drinking alcohol completely." A.R., p. 312. Under the

"Assessment/Plan" portion of the record, Dr. Ryan noted "[c]hronic alcohol abuse, the patient is

strongly encouraged to limit all alcohol from his diet including drinking alcohol as well as

topical alcohol pads. The patient voiced understanding." *Id.* at p. 313.

On February 2, 2006, Mr. Goetz visited Dr. Ryan for "reevaluation of hypertension."

A.R., p. 314. The record indicates that Mr. Goetz had undergone surgery for left hand carpel

tunnel syndrome two days prior to his visit to Dr. Ryan. *Id.* The record does not mention Mr.

Goetz's alcohol use, but states in the "Assessment/Plan" section: "Seizure disorder, no

recurrence on current Dilantin dose." A.R., p. 314.

On January 12, 2006 Dr. Ryan examined Mr. Goetz for "reevaluation of hypertension."

A.R., p. 316. At that time, Mr. Goetz "request[ed] an alcohol blood level today just for his

Board of Directors." *Id.* The assessment/plan section also mentions Mr. Goetz's "seizure

disorder." An addendum to the January record indicates that "[t]he patient requested random

alcohol level and we agreed to do that, the paper work was taken care of. The patient went down

to the lab to have blood work drawn, dropped off his clip board and informed the lab he would

be back at 4:30 to get lab work with no explanation." A.R, p. 317.

**D.    Defendants' Evaluation of Plaintiff's Claim for LTD Benefits**

Following Mr. Goetz's surgery and follow-up treatment, his wife completed an application for long term disability benefits pursuant to the Policy. *See* A.R., pp. 1315-1317. On June 29, 2006 a Senior Managed Disability Analyst at DRMS emailed an underwriting technician at DRMS about Mr. Goetz's claim. *See* A.R., p. 642. He stated, "[t]he application that I found in the UW file says that there is a 3/12 preX provision. Information that the employer sent in, which says it's a schedule of benefits, says that there is no preX provision." *Id.* He also sent an email on June 29, 2006 indicating that there was "conflicting info. re preX – the information we have says 3/12, the information sent in by the ER says no preX . . . ." A.R., p. 1319. On July 10, 2006 the underwriting technician confirmed that the pre-existing clause applied. A.R., pp. 641, 1320.

On July 11, 2006 GGL sent Mr. Goetz a letter confirming that it would be undertaking a medical review of pre-existing conditions. A.R., p. 1284. The letter stated, "Your effective date of coverage under the Greater Georgia Life Long Term Disability Insurance plan was 4/1/06. As you are claiming benefits for a disability which commenced within the first 12 months of your insurance coverage effective date, it is necessary for us to conduct a routine pre-existing investigation. The period of time we are reviewing is 1/1/06 to 4/1/06." A.R., p. 1284.

On September 7, 2006, a Wellpoint employee sent an email message to a DRMS employee regarding Mr. Goetz's claim. *See* A.R., p. 426. The email indicated in part that ". . . all the medical that has come in thus far does not even come close to showing a pre-ex condition." *Id.* The DRMS employee responded that they should proceed to review by a registered nurse. *Id.* at 429-30.

On September 14, 2006 a registered nurse medical consultant provided a written evaluation of her assessment of Mr. Goetz's medical records. She reviewed the records for a pre-existing condition. *See* A.R., pp. 362-364. After discussing Mr. Goetz's continuing disabilities, the nurse provided the following information:

> As noted above there are no records for review from Erlanger Medical Center documenting the extent of the clmt's injuries or possible etiology for the subdural hemtoma [sic]. Risk factors or things that could contribute to a subdural hematoma include chronic use of aspirin, treatment with blood thinners, and epilepsy associated with falls from seizures. The condition occurs most frequently in individuals with some degree of brain shrinkage (atrophy), such as chronic alcoholics . . . . The clmt has a known history of alcohol abuse and it has been reported that he presented at the time of the incident with alcohol in his system. The clmt also has a history of a brainstem cerebrovascular accident (date unknown), hypertension, chronic low back pain, patent foraminal ovale, history of increased liver enzymes, and sleep apnea.

> There is little medical information for review during the time period 1/1/06-4/1/06 to know whether the clmt was using alcohol or may have had other contributing factors to the subdural hematoma; however, there are pharmacy records with prescriptions written by Dr. Ryan. . . .

> **CONCLUSION:** . . .The pharmacy records document refills for multiple medications including phenytoin (used to treat seizure disorders), Avapro and Norvasc (used to treat hypertension), Plavix (an anti-platelet medication that helps keep platelets in the blood from sticking together and forming clots), Nexium (used to treat reflux symptoms), Folic acid (used to treat anemia caused by folic acid deficiency, liver disease, alcoholism, intestinal obstruction, etc.), and hydrocodone (a narcotic analgesic used to treat pain). It would be helpful to have the office notes of Dr. Ryan, the provider that wrote these prescriptions so that the indications of these medications can be verified. If it is confirmed that the clmt has been on folic acid secondary to his alcoholism and that the clmt's subdural hematoma was the result of a fall/trauma while using alcohol (blood alcohol tests are not available for review), the clmt's claimed impairment (subdural hematoma) could have been caused by, contributed to by, or the result of the clmt's alcoholism.

A.R., pp. 363-64.

On November 6, 2006 Defendants were working on drafting the initial denial of benefits

letter.  *See* A.R., p. 879.  On that date Wellpoint's Disability Case Manager, Carol Barrentine,

sent an email to DRMS asking some specific questions about the pre-existing condition

justification.  She noted:

> While there may be evidence in the clinical records, this letter does not show
> evidence of employee's alcohol use during the pre-ex period.  the letter sates [sic]
> there were previous falls, but are those falls documented alcohol abuse also
> mentioned, but are that [sic] any office notes that specifically addressed
> employee's alcohol abuse [sic]?  This evidence should be included in the letter.

A.R., p. 879.

On November 10, 2006 GGL sent Mr. Goetz a letter denying his application for LTD

benefits.  *See* A.R., pp. 1469-71.  The initial denial letter states in part:

> Based upon a review of the medical data provided, it appears that your subdural
> hematoma was the result of alcohol intoxication, as you had reported multiple
> falls at home and when you presented to the emergency room your blood alcohol
> level was significantly elevated and consistent with intoxication.  The medical
> data documents that you have a history of chronic alcohol abuse with prior
> episodes of withdrawal including seizure activity.  During the time period of
> 1/1/06 to 4/1/06 you were taking folic acid (phenyotin) as pharmacy records of
> 2/14/06 document, which is used to treat folic acid deficiencies often associated
> with alcohol abuse.  You were being treated for a history of seizures, with
> Dilantin, associated with prior alcohol withdrawal and without evidence of
> epilepsy as noted in pharmacy records of 2/17/06 and Dr. Ryan's office note of
> 2/2/06.  The records also indicated that you had requested a random blood alcohol
> level test for your Board of Directors as Dr. Ryan documents this in his office
> note of 1/12/06.  Dr. Ryan's notes also document a history of chronic alcohol
> abuse.  Your chronic alcohol use and intoxication on the date you were admitted
> to the hospital, on 5/28/06, appears to have caused or contributed to your subdural
> hematoma, as you had sustained multiple falls striking your head, which is most
> likely related to alcohol intoxication.  There is no other documented etiology for
> your acute subdural hematoma.  Therefore, as your disability was caused by falls
> and subsequent trauma to your head, due to alcohol intoxication, we must deny
> any liability on your claim.

A.R., pp. 1458-59.  On December 21, 2006 GGL sent a revised claim denial letter denying Mr.

Goetz's claim for benefits for substantially the same reasons.  *See* A.R., pp. 1458-1462.

On December 22, 2006 Mr. Goetz appealed the initial denial of benefits. *See* A.R., p 1938. On January 16, 2007 Dr. Jerry DiDonna, M.D., a Board Certified Internist, completed a medical review of Plaintiff's file. A.R., pp. 1928-31. Dr. DiDonna made the following conclusions:

> The occurrence of subdural hematoma is caused and contributed to by alcohol intoxication causing incoordination and falling when the person is intoxicated due to significant balance and coordination problems as a result to the effect of alcohol on the central nervous system.

> In addition, in this case the presence of anticoagulant medications in the form of antiplatelet agents, aspirin and Plavix, which the insured was taking would lead to an increased tendency to bleeding, including subdural hemorrhage, if one incurred head trauma due to a fall or several falls as in this case, based on a reasonable degree of medical probability.

> In addition, the other condition that he had which could cause or contribute to the fall which led to the subdural hematoma would be a seizure which he had been known to have when withdrawing from alcohol. In the absence of alcohol intoxication this could have caused him to strike his head, causing the subdural hemorrhage again based on a reasonable degree of medical probability if he indeed had seizures that were not controlled with his medications. . . .

> The insured did receive treatment, consultation and care or took medications that caused or contributed to the impairing condition of a subdural hemorrhage which was, based on a reasonable degree of medical certainty, caused and contributed to by alcohol intoxication and chronic alcoholism for which he was treated in the past. The medical evidence shows that he asked for a blood alcohol level for his Board of Directors in January 2006 at a time when he has said he was abstaining from alcohol. Again he had a positive blood alcohol level on 3/26/06 which was a period of time when it was not known that he was still drinking alcohol. He also had an elevated blood alcohol level when he was admitted with the Subdural Hemorrhage. . . .

> Based on a reasonable degree of medical certainty, therefore, the insured had conditions during the pre-existing period which caused or contributed to the condition which led to his impairment and persistent cognitive difficulty and mild residual right hemiparesis.

A.R., pp. 1930-31.

-10-

Following Dr. DiDonna's medical review, GGL determined to uphold the original denial of benefits on January 23, 2007.  *See* A.R., p. 1920, 1884-88.  Mr. Goetz's attorneys then requested a second appeal on March 14, 2007, which GGL denied on April 17, 2007.  *See* A.R., pp. 1857-1861, 1872-73, 1875-78.  The record reveals that DRMS, the claim administrator for GGL, provided detailed analysis and suggested wording regarding Mr. Goetz's claim, initial denial of that claim, and the denial of subsequent appeals.  *See e.g.*, A.R., pp. 1862-1864.  In many cases GGL simply supplied the letterhead and copied DRMS' suggested language verbatim regarding Mr. Goetz's claim. *Compare* A.R., pp. 1865-67 with 1857-1860; *compare* A.R., pp. 1284 with 1292.  In some cases, GGL even copied information that was not intended to be seen by the claimant, such as "PLEASE INSERT GGL GREETING."  *See* A.R., pp. 1284, 1292.

## II.     Analysis

### A.     ERISA Standard of Review

ERISA provides for district court review of a denial of benefits by a plan administrator.

29 U.S.C. § 1132(a)(1)(B) provides:

> A civil action may be brought –
> (1) by a participant or beneficiary – . . .
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .

29 U.S.C. § 1132(a)(1)(B).  "An employee may challenge a benefit eligibility determination under 29 U.S.C. § 1132(a)(1)(B)."  *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).  However, it is the employee's "burden to show that he was entitled to 'benefits . . . under the terms of his plan.'" *Farley v. Benefit Trust Ins. Co.,* 979 F.2d 653, 658 (8th Cir.

1992) (citing 29 U.S.C. § 1132(a)(1)(B)).

Generally, a court must first determine the standard of review and then determine whether to affirm the plan administrator's decision by applying the proper standard based on the administrative record relied upon by the plan administrator. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). It is a general principle of ERISA law that a plan administrator's denial of benefits is subject to *de novo* review, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003) (quoting *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).

In addition, "[w]hile 'magic words' are unnecessary to vest discretion in the plan administrator and trigger the arbitrary and capricious standard of review, this circuit has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'" *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994)). When the plan documents give the plan administrator discretionary authority to determine benefits, the plan administrator's decision to deny benefits will be reviewed "under the 'highly deferential arbitrary and capricious standard of review.'" *McDonald*, 347 F.3d at 168-69 (quoting *Yeager*, 88 F.3d at 380).

When using the arbitrary and capricious standard to review the denial of benefits under an ERISA plan, the Court is "required to consider only the facts known to the plan administrator

at the time he made his decision." *Yeager*, 88 F.3d at 381 (citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). Further,

> . . . "the highly deferential arbitrary and capricious standard of review" *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996); *see Firestone Tire Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) . . . "is the least demanding form of judicial review of administrative action . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food and Commercial Workers Dist. Unions 405 & 422*, 64 F.3d 238, 241 (6th Cir. 1995) (citations and internal quotation marks omitted). Thus, the standard requires that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Baker v. United Mine Workers of America, Health & Retirment Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

*Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). "An ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are 'rational in light of the plan's provisions.'" *Yeager*, 88 F.3d at 381 (quoting *Miller*, 925 F.2d at 984; *see also McDonald*, 347 F.3d at 169. This does not mean that review of the plan administrator's decision is not "without some teeth." *McDonald*, 347 F.3d at 172. As the Sixth Circuit has made clear, "'[d]eferential review is not no review,' and 'deference need not be abject.'" *Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). As the Court explained in *McDonald*:

> the district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence – no matter how obscure or untrustworthy – to support a denial of a claim for ERISA benefits.

347 F.3d at 172. *See also, Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir.

-13-

2006); *Helfman v. GE Group Life Assurance Co.*, __ F.3d __, 2009 WL 2191516, *11 (6th Cir.

2009). In addition, "[i]ndications of arbitrary and capricious decisions include a lack of

substantial evidence, a mistake of law, bad faith, and a conflict of interest by the decision-

maker." *Murdock v. Metropolitan Life Ins., Co.*, No. 1:06cv02731, 2007 WL 6097205, *5 (N.D.

Ohio Dec. 31, 2007) (citing *Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1282

(10th Cir. 2002)). Further, courts may find that a denial of benefits was arbitrary and capricious

where there is little evidence that the plan administrator engaged in a "principled reasoning

process." *Elliott*, 473 F.3d at 620. An example of arbitrary and capricious behavior might

include a situation where the plan administrator "gave 'greater weight' to a non-treating

physician's opinion [over a treating physician's opinion] for no apparent reason. . . ." *Id.*

The United States Supreme Court recently explained how courts should review denials of

ERISA benefits where a conflict of interest is involved. *See Metropolitan Life Ins. Co. v. Glenn*,

___ U.S. ___, 128 S.Ct. 2343 (2008). In *Glenn* the Supreme Court determined that a common

ERISA conflict of interest, one in which the insurer who pays the benefits is also the party

responsible for determining whether benefits should be awarded, should be considered by courts

as a factor when courts review denials of benefits. *Id.* at 2348-2352. The court instructed lower

courts:

> [w]e turn to the question of "how" the conflict we have just identified should "be
> taken into account on judicial review of a discretionary benefit determination." In
> doing so, we elucidate what this Court set forth in *Firestone*, namely, that a
> conflict should "be weighted as a 'factor in determining whether there is an abuse
> of discretion.'" . . .
>
> We do not believe that *Firestone's* statement implies a change in the *standard* of
> review, say, from deferential to *de novo* review. . . .
>
> Nor would we overturn *Firestone* by adopting a rule that in practice could bring

about near universal review by judges *de novo* – *i.e.*, without deference – of the lion's share of ERISA plan claims denials. . . .

Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account. Benefits decisions arise in too many contexts, concern too many circumstances, and can relate in too many ways to conflicts – which themselves vary in kind and in degree of seriousness – for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review. Indeed, special procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress.

We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.

*Glenn*, __ U.S. __, 128 S.Ct. at 2350-2351 (citing *Firestone, Tire & Rubber Co.*, 489 U.S. 101) (other citations omitted).

The Sixth Circuit has directed that where a disability plan is covered by ERISA:

we apply federal common law rules of contract interpretation in making our determination. In developing federal common law rules of contract interpretation, we take direction from both state law and general contract law principles. The general principles of contract law dictate that we interpret the Plan's provisions according to their plain meaning, in an ordinary and popular sense.

*Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998).

Other district courts in this Circuit have considered whether a plan administrator is

entitled to deference when it contracts with a third-party administrator to make decisions

regarding eligibility for benefits. As the district court in *Crider v. Highmark Life Ins. Co.* noted:

The Sixth Circuit "has read *Firestone v. Bruch* to hold that discretion is the exception, not the rule and that the arbitrary and capricious standard does not apply unless there is a *clear* grant of discretion to determine benefits or interpret the plan." The party claiming entitlement to review under an arbitrary and capricious standard therefore has the burden of proving that the standard applies. While no particular language is necessary to vest the plan administrator with

-15-

discretion to interpret the plan or make benefit determinations, the Sixth Circuit "has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'"

458 F.Supp.2d 487, 501 (W.D. Mich. 2006) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) and *Perez*, 150 F.3d at 555) (other citations omitted).

While discretion may be granted to a plan administrator, if that plan administrator does not make the actual decision to terminate or deny benefits, the third-party administrator may not be granted discretion where the plan does not provide for discretion to the third-party administrator. For example, in *Crider*, the district court determined that the termination of benefits was subject to *de novo* review because the plan did not provide for discretion to a third-party administrator. 458 F.Supp.2d at 501-02. The court explained:

> If [the original plan administrator] had actually made the decision to terminate plaintiff's benefits, [the plan administrator] would be entitled to this deferential standard of review. Here, however, the [plan administrator] delegated that decision to [a third-party administrator]. The delegation was apparently unwritten and informal, as the record is devoid of any contract or other document establishing the authority of [the third-party administrator]. The factual record points inescapably, however, to the conclusion that [the third-party administrator] and not the [original plan administrator] made the decision to terminate plaintiff's benefits. All of the investigatory work leading up to the issuance of the October 19, 2004 termination letter was done by [the third-party administrator] or its contractors. The letter itself was on [the third-party administrator's] stationery and was signed by Shirley Heera, a [third-party administrator] disability claims specialist. The record reflects no input, or even knowledge, by [the original plan administrator] predating the issuance of the termination letter. The letter was not tentative nor was it made contingent on the approval of [the original plan administrator]. . . . [The third-party administrator] clearly made the decision to terminate. The record indicates that [the original plan administrator] became involved only months later, in response to plaintiff's appeal, after the termination decision was already made and implemented.

458 F.Supp.2d at 501-02. An ERISA plan itself may properly delegate discretionary authority to another fiduciary. *Id.* at 502 (citing 29 U.S.C. § 1105(c)(1); *Lee v. MBNA Long Term Disability*

*& Benefit Plan*, 136 F. App'x. 734, 742 (6th Cir. 2005)).   ERISA provides that:

> The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

29 U.S.C. § 1105(c)(1).  The court determined that *de novo* review applied because the plan at issue did not provide an express delegation of discretionary authority to the third-party administrator.  *Id.* at 503.

In this action, the Policy provides, "[i]n making any benefits determination under the Policy, the Insurance Company shall have the discretionary authority both to determine an individual's eligibility for benefits and to construe the terms of the Policy."  A.R., p. 1846.  Although the term "Insurance Company" is not defined, and the Policy itself is somewhat generic, the court concludes that the term "Company" was used throughout the Policy to refer to GGL.  The Policy does not provide for discretionary review to be given to a third-party claims administrator.  However, this court finds the instant action distinguishable from the situation present in *Crider*.  458 F.Supp.2d 487.  Although the record reveals that the third-party claims administrator, DRMS, drafted many of the letters sent to Mr. Goetz regarding his LTD claim, it also reveals that individuals from GGL were involved in corresponding and communicating via email regarding Plaintiff's claim at its earliest stages.  *See e.g.*, A.R., p. 1382 (email from Sokie Chay to Precept Ministries' human resources manager dated August 7, 2006; Ms. Chay's address matches GGL's address in GGL's letterhead, *see* A.R., pp. 1469, 1497).  In addition, although DRMS drafted most of the correspondence with Mr. Goetz, all of the letters regarding the LTD claim were sent under GGL's letterhead with a GGL employee's signature.  *See e.g.*, A.R., pp.

-17-

802-806 (letter sent from GGL); 812-814 (suggested wording from DRMS). Further, requests

for information from Plaintiff's health care providers were sent by GGL and not DRMS. *See*

*e.g.*, A.R., pp. 1495-1498. Based on GGL's involvement in the entire decision-making process,

the court concludes that, unlike the situation in *Crider*, GGL itself was making the ultimate

decisions regarding Mr. Goetz's LTD benefits. Therefore, it has properly given itself

discretionary authority to make those decisions, and the "arbitrary and capricious" standard of

review is appropriate.

However, the court is mindful of the innate conflict of interest present in GGL's decision

in this action. GGL, as the LTD insurer, is financially responsible for providing any LTD

benefits. Further, as the ultimate decisionmaker, it determines eligibility under the Policy. Thus,

GGL has a financial incentive not to award benefits. As the Supreme Court in *Glenn* instructed,

although this does not change the standard of review, GGL's innate conflict of interest is a factor

to be considered when reviewing its decision to deny Mr. Goetz's LTD benefits. *See Glenn*, __

U.S. __, 128 S.Ct. at 2350-2351.

**B.      Analysis of GGL's Denial of Benefits**

The Policy contains a provision for exclusion of pre-existing conditions. *See* A.R., p.

170. The exclusion states:

> 1.      If the 3/12 Exclusion was chosen in box 18 of the
> application, then the following applies to this policy:
> This policy will not cover any disability:
> a.      caused by, contributed to by, or resulting from a pre-
> existing condition; and
> b.      which begins in the first 12 months after an insured's
> effective date.
> A "pre-existing condition" means a sickness or injury for which
> the insured received medical treatment, consultation, care or
> services including diagnostic measures, or had taken prescribed

-18-

drugs or medicines in the three months prior to the insured's
effective date.

A.R., p. 170.  The Policy defines "injury" as a "bodily injury resulting directly from an accident
and independently of all other causes.  The injury must occur and disability must begin while the
employee is insured under this policy."  A.R., p. 160.  The Policy defines "sickness" as "illness
or disease."  A.R., p. 161.  The terms "caused by, contributed to by, or resulting from" are not
defined.

Although the Schedule of Insurance indicates that there was no pre-existing condition
limitation on the Policy, *see* A.R., p. 1346, the Court concludes that the 3/12 pre-existing
condition limitation applied.  The Master Application clearly shows a checked box beside the
line for the 3/12 pre-existing condition.  *See* A.R., p. 1786.  The Policy itself contemplates the
3/12 limitation applying where that box is marked with a check.  It states, "If the 3/12 Exclusion
was chosen in box 18 of the application, then the following applies to this policy . . . ."  A.R., p.
170.  Although there was initial confusion over whether the pre-existing exclusion applied, the
Policy states that "[t]he Company will provide a certificate to the policyholder for delivery to
each insured.  If the terms of a certificate and this policy differ, this policy will govern."  A.R., p.
1843.  It is not clear if the document labeled "Schedule of Insurance" is intended to be the
"certificate" mentioned in the Policy, but it does appear that GGL contemplated the confusion
present here and chose to make the terms of the Policy paramount.  Nor does the "Schedule of
Insurance" appear to be a summary plan description found in an employee benefits handbook.
The record does not reveal whether there was a summary plan description provided to employees
of Precept Ministries relating to the Policy.  The Sixth Circuit has held that a summary plan
description's language will control over conflicting language in the plan itself, but in this case,

-19-

the "Schedule of Insurance" does not provide the level of detail of coverage required by a summary plan description. *See University Hosp. of Cleveland*, 202 F.3d 839, 850-51 (6th Cir. 2000); 29 U.S.C. § 1022. Therefore, the court concludes that the specific 3/12 pre-existing condition provision applies to the Policy.

The question now to be determined is whether Plaintiff's alleged "chronic alcoholism" constitutes a "pre-existing condition" under the terms of the Policy which "caused, contributed to or resulted" in the Plaintiff's disability. The parties do not dispute that Plaintiff's subdural hematoma has left him with multiple, significant disabilities which have rendered him unable to return to his prior occupation. Therefore, the scope of the disability and its duration or future prognosis are not at issue in this action.

The case law describing analysis of similar pre-existing condition limitations in ERISA policies with similar facts is highly dependent on the individualized factual scenarios at issue in each situation. For example, in *University Hospitals of Cleveland v. Emerson Elec. Co.* the Sixth Circuit addressed whether the plaintiff's claim for medical expenses it paid on behalf of the assignor/decedent were properly denied under a pre-existing condition provision. 202 F.3d 839 (6th Cir. 2000). The plaintiff hospital provided medical treatment to the assignor, an employee of defendant company and an ERISA plan beneficiary, for myelodyspastic syndrome, a bone marrow disease. *Id.* at 842. The treatment occurred from March 27, 1991 until June 3, 1991, when the employee died. *Id.* The main dispute between the parties was whether the employee suffered from a pre-existing condition. *Id.* On September 11, 1990, before he started working at the defendant company, the employee's physician diagnosed him as suffering from anemia and recommended a blood test. *Id.* On September 28, 1990, after the employee began working for

-20-

the defendant company, the employee's physician informed him that the iron, folic acid, and B-12 portions of the test were normal, but he recommended repeating the blood test based on the anemia diagnosis. *Id.* The second test results demonstrated low red blood cell and platelet counts, low hemoglobin and hematoocrit values and elevated MCV and MCH levels. The employee's doctor recommended that he see a hematologist. *Id.* at 843. The employee declined to see a hematologist until two weeks after his ERISA plan eligibility date. *Id.* The hematologist diagnosed him with mild anemia and moderately severe thrombocytopenia. Following a battery of tests and procedures, the employee was ultimately diagnosed with myelodysplastic syndrome which evolved to acute leukemia and led to his death on June 3, 1991. The ERISA plan at issue provided in relevant part: "No benefits are payable for a pre-existing illness or injury for which an individual was treated or took prescribed medicine within 3 months prior to coverage until: . . . the individual has been free of treatment for the pre-existing illness or injury for 3 months." *Id.* at 843.

The court reviewed the plan under the "arbitrary and capricious" standard of review, but "tempered" its deferential review based on the possible conflict of interest. *Id.* at 846. The Court determined that the employer's determination that the employee received "treatment or services" within the three months prior to his ERISA policy eligibility was "reasonable in light of the available evidence." *Id.* at 847. In making its determination, the employer "obtained and considered two separate and independent medical opinions, both of which indicated that the condition diagnosed in early 1991 was a continuation of the condition for which [the employee] sought treatment in September of 1990." *Id.* The court found that "where the [defendant's] decision enjoys the support of two independent medical opinions, it is sufficiently grounded in

reason and evidence to satisfy the 'least demanding form of judicial review,' the arbitrary and capricious standard." *Id.* The court further noted that "complete consensus is not required to establish a reasoned basis for an administrative decision." *Id.* The court held, however, that the denial of benefits was arbitrary and capricious because the employee had satisfied the language of the plan requiring him to not receive treatment for the pre-existing condition for three months. *Id.* at 850-52.

In *Pitcher v. Principal Mut. Life Ins. Co.*, the Seventh Circuit analyzed whether treatment for a fibrous breast condition that later proved to be breast cancer satisfied a pre-existing exclusion provision. 93 F.3d 407 (7th Cir. 1996). The policy defined pre-existing condition as "a sickness or injury for which a Member or Dependent is confined or received *treatment or service* in the 90-day period before he or she became insured under this policy." *Id.* at 409. The court found that the plaintiff had suffered from a "fibrocystic breast condition" for twenty years, which was common and did not develop into breast cancer. *Id.* On July 31, 1992 the plaintiff's physician discovered lumps in both breasts. The doctor concluded that the lumps were probably related to plaintiff's ongoing fibrocystic breast condition. *Id.* Plaintiff returned for a follow-up appointment on September 15, 1992, and her insurance policy became effective two days later. Because the lumps had not disappeared, plaintiff's doctor recommended that she receive a mammogram that day. The mammogram revealed a suspicious mass in one breast warranting a biopsy. The day after plaintiff's insurance became effective, she underwent a biopsy, which revealed a malignant tumor. The plaintiff underwent surgery followed by a course of radiation. *Id.* The plaintiff applied for benefits under her plan to cover the biopsy, surgery, and radiation treatment. The defendant denied plaintiff's claim, concluding that the pre-existing exclusion

applied. *Id.* at 410. The Court determined that the "key question" was whether the plaintiff had received "treatment or service" *for* breast cancer during the relevant time period. *Id.* at 411. It considered whether the initial examination and discovery of the lumps, the follow-up examination, or the mammogram constituted treatment for breast cancer. *Id.* at 412. The Court held "that [plaintiff] did *not* receive a 'treatment or service' *for* breast cancer prior to September 17, 1992 because – as the district court found – she was being monitored for the longstanding fibrocystic breast condition and not cancer during the pre-coverage period." *Id.* The court concluded that the three medical visits at issue could not constitute treatment or service *for* breast cancer, and the mammogram was "rendered solely for and in connection with the ongoing monitoring of her fibrocystic breast condition." *Id.* at 413. It affirmed the district court's grant of summary judgment to the plaintiff. *Id.* at 417. *See also, Hardester v. Lincoln Nat. Life Ins. Co.*, 52 F.3d 70 (4th Cir. 1995) (en banc) (reversing panel decision for reasons expressed in dissenting opinion *Hardester v. Lincoln Nat. Life Ins. Co.*, 33 F.3d 330 (4th Cir. 1994) (Hall, J., dissenting)). In *Hardester* the Fourth Circuit, in an en banc opinion, relied on the dissent's opinion in the reversed panel decision. 52 F.3d 70. In the earlier dissent, the dissenting judge found that where breast cancer was discovered in the "course of treating an unrelated manifest condition," the pre-existing clause did not apply. 33 F.3d at 339.

In *Bullwinkel v. New England Mut. Life Ins. Co.*, distinguished by both the *Hardester* dissent and *Pitcher*, the Seventh Circuit found a pre-existing exclusion for chemotherapy and cancer radiation treatments where a single lump in the breast was found, but undiagnosed, during the pre-existing period. 18 F.3d 429 (7th Cir. 1994). The court in *Bullwinkel* found several aspects which made the case unique, including that the "the lump discovered in July was not a

trivial and inconclusive symptom." *Id.* at 433. *See also, Kirk v. Provident Life and Acc. Ins. Co.*, 942 F.2d 504 (8th Cir. 1991) (affirming district court decision to uphold insurance company's denial of benefits under pre-existing condition exclusion based on symptoms of pain, night sweats, and aches that were later diagnosed as bacterial endocarditis, a heart condition requiring surgery); *Cash v. Wal-mart Group Health Plan*, 107 F.3d 637 (8th Cir. 1997) (determining that previous diagnosis of diverticular disease made later diverticulitis diagnosis a pre-existing condition for which benefits were properly denied).

In *Fought v. Unum Life Ins. Co. of Am.*, the Tenth Circuit addressed whether a severe staph infection following elective heart surgery that disabled the plaintiff constituted a pre-existing condition properly excluded from disability benefit coverage. 379 F.3d 997 (10th Cir. 2004) (standard of review abrogated in part by *Glenn*, __ U.S. ___, 128 S.Ct. 2343 as described in *Holcomb v. Unum Life Ins. Co. of America*, __ F.3d __, 2009 WL 2436673 (10th Cir. 2009)). The defendant denied the plaintiff's disability coverage, finding that "the pre-existing coronary artery condition" "'caused,' 'contributed to,' or 'resulted in'" the plaintiff's disability. *Id.* at 999. The plan in that case provided no definition of the terms caused, contributed to, or resulting from. *Id.* It further provided that a participant had a pre-existing condition if

> you received medical treatment, consultation, care or services including diagnostic measure or took prescribed drugs or medicines in the 3 months just prior to your effective date of coverage; or you had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months just prior to your effective date of coverage; and the disability begins in the first 12 months after your effective date of coverage.

*Id.* at 999.

Before the plaintiff enrolled in the disability plan, she was diagnosed with coronary artery disease. *Id.* Three months after her enrollment in the plan, she underwent angioplasty.

Following the angioplasty, she underwent an elective coronary artery revascularization surgery. Because her sternum was narrow and osteoporotic, her doctors used a special procedure to close the wound. Three weeks later, the plaintiff's wound reopened. *Id.* at 1000. At that time there were a few bacteria in the wound, and her physicians placed her on antibiotics. After five days of treatment, the wound appeared to be healing satisfactorily. Several weeks later, the plaintiff was readmitted to the hospital following right-side chest pain. *Id.* At that time she had developed a serious staph infection requiring placement in the intensive care unit, several operations, sedation, and hemodynamic monitoring. The defendant denied coverage for this treatment finding that it constituted a pre-existing condition. *Id.* The plaintiff appealed the decision and submitted letters from three physicians stating that the staph infection was not related to the pre-existing coronary artery disease. *Id.* The company denied the appeal, finding that the staph infection was the result of surgery performed for the pre-existing cardiac condition. *Id.* at 1001. The Tenth Circuit reviewed the defendant's decision with reduced deference due to an admitted conflict of interest and analyzed whether the defendant had established by substantial evidence that the plaintiff's disability was not covered by the plan. *Id.* at 1003-07.

The Tenth Circuit then analyzed at length a chain of causation events:

"Cause" means "[t]o be the cause of," which is "[s]omething that produces an effect, result, or consequence." "Contributed" is defined broadly as "[t]o act as a determining factor." "Results" means "to happen or exist as a result of a cause." . . . The major difficulty presented by this case is that [defendant's] policy excludes coverage *for disabilities caused by* pre-existing conditions, whereas it seeks here to apply its policy as if it excludes coverage for disabilities caused *by complications from surgery for pre-existing conditions*. Surgery is not, of course, a pre-existing condition, but at most a necessary consequence of a pre-existing condition. In essence, therefore, this case becomes a matter of where we draw the line on chains of causation.

-25-

[Defendant] responds that the broad language of the pre-existing condition dictates a similarly broad interpretation of the exclusion: the exclusion does not require that the disabling condition be the sole or direct result of the pre-existing condition. Here, [defendant] applies the limitation because it believes the disabling condition was "caused by, contributed to, or resulted from" [plaintiff's] pre-existing condition. Based on the common ordinary meaning of the terms "cause," "contribute," and "result," [defendant] contends, the "exclusion merely requires that [plaintiff's] pre-existing heart condition be 'something' that brought about the disabling condition or that played a significant part in bringing about the disabling condition, or that the disabling condition arose as a consequence of the pre-existing condition.

In practice, however, [defendant's] arguments rely upon classic but/for causation: But for the coronary artery disease, none of the rest of the chain of events would have happened. . . .

For [plaintiff] there were at least five intervening stages between the pre-existing coronary artery disease and the disability: The failure of non-surgical alternatives, initially successful elective surgery, later complications from that surgery, initially successful treatment of those complications, and finally a drug resistant infection due to those complications, which in itself may have been caused by the intervening presence of Staphylococcus aureus due to faulty sterilization, sanitation, etc. [Defendant] seems to suggest that it need not cover anything for which it can construct a but/for story.

279 F.3d at 1009-10 (quoting WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 239, 306, 1002 (1988)).

In determining that the defendant's review of the pre-existing exclusion provision was overly expansive, the Tenth Circuit relied on 29 C.F.R. § 2590.701-3(a)(i)(C), Example 5, a Department of Labor regulation pertaining to the application of ERISA. *See Fought*, 379 F.3d at 1010. 29 C.F.R. § 2590.701-3(a)(2) states: ". . . a group health plan, and a health insurance issuer offering group health insurance coverage, may impose, with respect to a participant or beneficiary, a preexisting condition exclusion only if the requirements of this paragraph (a)(2) are satisfied." Paragraph (a)(2) provides examples of its 6-month look-back rule:

A preexisting condition exclusion must relate to a condition (whether physical or

mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6-month period (or such shorter period as applies under the plan) ending on the enrollment date. . . .

(C) The rules of this paragraph (a)(2)(i) are illustrated by the following examples: . . .

Example 5. (i) Facts. Individual D, who is subject to a preexisting condition exclusion imposed by Employer U's plan, has diabetes, as well as retinal degeneration, a foot condition, and poor circulation (all of which are conditions that may be directly attributed to diabetes). D receives treatment for these conditions during the 6-month period ending on D's enrollment date in Employer U's plan. After enrolling in the plan, D stumbles and breaks a leg.

(ii) Conclusion. In this Example 5, *the leg fracture is not a condition related to D's diabetes, retinal degeneration, foot condition, or poor circulation, even though they may have contributed to the accident*. Therefore, benefits to treat the leg fracture cannot be subject to a preexisting condition exclusion. However, any additional medical services that may be needed because of D's preexisting diabetes, poor circulation, or retinal degeneration that would not be needed by another patient with a broken leg who does not have these conditions may be subject to the preexisting condition exclusion imposed under Employer U's plan.

29 C.F.R. § 2590.701-3(a)(2)(i)(C), Example 5 (emphasis added). The Tenth Circuit held that

The exclusion cannot merely require that the pre-existing condition be one in a series of factors that contributes to the disabling condition; the disabling condition must be substantially or directly attributable to the pre-existing condition. *See also* WEBSTER'S II NEW RIVERSIDE DICTIONARY 306 (defining contribute as to mean "to act as a determining factor"). . . . To read the exclusion as broadly as [defendant], counters the essential tenets of contract law: Exclusions must be interpreted narrowly.

*Fought*, 379 F.3d at 1011. In making its determination, the Tenth Circuit distinguished cases like *Cash*, by finding that there was no "necessary precursor link" between the plaintiff's staph infection and her coronary artery disease: "[s]taph infections are *not*, so far as we are aware, a well-known complication of coronary artery disease." *Id.* (citing *Cash*, 107 F.3d 637; *Holsey v. UNUM Life Ins. Co. of America*, 944 F.Supp. 573, 579 (E.D. Mich. 1996)). The Tenth Circuit found that the denial of benefits was not supported by substantial evidence and that the "plan's language [did] not reasonably apply to the attenuated chain of events . . . ." *Id.* at 1015.

-27-

In *Vander Pas v. Unum Life Ins. Co. of America*, the district court addressed whether the plaintiff's use of the drug Coumadin in the months prior to his eligibility under a disability plan constituted a pre-existing condition when the plaintiff later suffered from a subdural hematoma. 7 F.Supp.2d 1011, 1012-13 (E.D. Wis. 1998). The plaintiff's physician prescribed Coumadin to him because of his atrial fibrillation, which could cause blood clots and could increase the risk of stroke. *Id.* at 1013. Coumadin is an anti-coagulant which reduced the risk of blood clots, but which "may also predispose an individual to experience a subdural hematoma." *Id.* Reviewing the plan under the "arbitrary and capricious" standard, the district court reversed the denial of benefits, noting:

> In its July 29, 1996, explanation, [defendant] recounts some of the plaintiff's medical history, but depicts only Coumadin as the trigger for the pre-existing condition exclusion. In fact, the chain of causation appears more attenuated: the plaintiff's atrial fibrillation caused him to take Coumadin, which brought about his subdural hematoma, which produced his disability. In spite of this, [defendant's] claim review offers no reasoning, no proximate cause analysis, no extrinsic evidence, no construction of ambiguous policy language, and no discussion of the facts of this case in light of this ambiguity to explain how it arrived at the conclusion that Coumadin was a "pre-existing condition" under the Policy.

7 F.Supp.2d at 1018.

When interpreting ambiguous language in an ERISA plan, the Sixth Circuit has provided guidance on contract interpretation:

> The question of whether the language of the Plan is ambiguous is a question of law requiring de novo review. The language is ambiguous if it is subject to two reasonable interpretations. The phrase at issue in this case is ambiguous. Both parties have offered plausible interpretations of the Plan language, and there is authority supporting either construction. Because the language in the Plan is reasonably susceptible to either interpretation, we may look at any extrinsic evidence available.
>> [I]f the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional

> methods of contract interpretation to resolve the ambiguity,
> including drawing inferences and presumptions and introducing
> extrinsic evidence.
>
> When interpreting a contract, courts look not only at the language, but also for
> additional evidence that reflects the intent of the contracting parties. Unlike some
> courts, we have held that a court conducting a de novo review in an ERISA case
> is confined to evidence that was included in the record upon which the
> administrator based its decision.

*Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994) (quoting *Boyer v. Douglas*

*Components*, 986 F.2d 999, 1005 (6th Cir. 1993)) (other citations omitted). In *Wulf* the Sixth

Circuit was not applying discretionary review to the plan administrator's interpretation. 26 F.3d

at 1374.

If the "arbitrary and capricious" standard of review applies, then the Sixth Circuit has

directed that "we grant plan administrators who are vested with discretion in determining

eligibility for benefits great leeway in interpreting ambiguous terms." *Moos v. Square D Co.*, 72

F.3d 39, 42 (6th Cir. 1995); *see also*, *Fuller v. National Union Fire Ins. Co. of Pittsburgh, PA*,

No. 07-138-ART, 2008 WL 2224885, *5 (E.D. Ky. May 27, 2008). However, other Sixth

Circuit decisions indicate that when a court is analyzing provisions of an ERISA policy,

> "A technical construction of a policy's language which would defeat a reasonable
> expectation of coverage is not favored . . . . Accordingly, an insurer has a duty to
> express clearly the limitations in its policy; any ambiguity will be construed
> liberally in favor of the insured and strictly against the insurer."

*Citizens Ins. Co. of America v. MidMichigan Health*, 449 F.3d 688, 692 (6th Cir. 2006) (quoting

*Regents of Univ. of Michigan v. Employees of Agency Rent-A-Car*, 122 F.3d 336, 339 (6th Cir.

1997)). This rule of contract interpretation is known as *contra proferentem*. In *Citizens Ins. Co.*

the Sixth Circuit noted that where an opinion is based on an interpretation of policy language,

such an interpretation is "a purely legal question requiring *de novo* review." 449 F.3d at 691

-29-

(citing *Boyer*, 986 F.2d at 1003).

In *Fuller* the district court relied on the opinion in *Moos* in determining that the rule of *contra proferentem* did not apply where there is an arbitrary and capricious standard of review. 2008 WL 2224885 at *5. The district court in that case outlined the conflict among existing authorities in the Sixth Circuit:

> In *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000) – a case using the arbitrary and capricious standard – the Sixth Circuit noted that it would apply the rule of *contra proferentem*. Subsequent unpublished Sixth Circuit cases have called this contention into question, however. In *Mitchell v. Dialysis Clinic, Inc.*, No. 00-5467, 2001 WL 1006291, at *3 (6th Cir. Aug. 24, 2001) (unpublished), the court, referencing *University Hospitals's* use of *contra proferentem*, stated, "[w]e do not believe that through these statements this Circuit has established a rule of interpretation that would completely contradict the deference paid to an administrator's decision." Similarly, in *Smiljanich*, 2006 WL 1477932, at *5, *5 n.2, the Sixth Circuit relied on *Moos* in granting the plan administrator discretion to resolve a conflict between two provisions in an ERISA plan and declined to follow *University Hospitals*. The *Smiljanich* panel found that granting the administrator discretion to construe ambiguous terms was more consistent with the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), which explained the appropriate standard of review in ERISA benefits cases. . . . This Court, therefore, will not use the rule of *contra proferentem* in interpreting any ambiguous terms in the Policy.

*Fuller*, 2008 WL 2224885 at *6.

In this action the Policy provides that "[i]n making any benefits determination under the Policy, the Insurance Company shall have the discretionary authority both to determine an individual's eligibility for benefits and to construe the terms of the Policy." A.R., p. 1846. Further, this court has determined that the "arbitrary and capricious" standard of review, with the conflict of interest weighed as a factor, applies. Because this court finds GGL's decision arbitrary and capricious, it will not delve into the thicket of whether the doctrine of *contra proferentem* applies when reviewing the ambiguous language of an ERISA plan subject to

-30-

arbitrary and capricious review.

The pre-existing condition provision states:

1.      If the 3/12 Exclusion was chosen in box 18 of the application, then the following applies to this policy:
This policy will not cover any disability:
a.      caused by, contributed to by, or resulting from a pre-existing condition; and
b.      which begins in the first 12 months after an insured's effective date.
A "pre-existing condition" means a sickness or injury for which the insured received medical treatment, consultation, care or services including diagnostic measures, or had taken prescribed drugs or medicines in the three months prior to the insured's effective date.

A.R., p. 170.  The Policy defines "injury" as a "bodily injury resulting directly from an accident and independently of all other causes.  The injury must occur and disability must begin while the employee is insured under this policy."  A.R., p. 160.  The Policy defines "sickness" as "illness or disease."  A.R., p. 161.  The Policy does not define the terms "caused by, contributed to by, or resulting from."

Webster's Dictionary defines "cause" as "to serve as cause or occasion or: bring into existence: make."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 356 (1993).  The noun version of "cause" is defined as "a person, thing, fact, or condition that brings about an effect or that produces or calls forth a resultant action or state; something that occasions or effects a result: the necessary antecedent of an effect: something that determines any motion or change or produces a phenomenon."  *Id.*  "Contribute" means "to have a share in any act or effect."  *Id.* at 496.  "Result" means "to proceed, spring, or arise as a consequence, effect, or conclusion: come out or have an issue."  *Id.* at 1937.

The definitions of cause and result suggest necessary antecedents to a specific effect or

-31-

conclusion. However, the definition of contribute is broader and suggests playing a part rather than being a necessary precursor to a conclusion.

In this case the medical records indicate some vague suggestions that Mr. Goetz was a "chronic alcoholic." This term is not defined and there does not appear to be any medical analysis of Mr. Goetz's actual alcoholic intake during the pre-existing condition period except for a brief mention of his blood alcohol content on one occasion in March. There are some suggestions in the record that Mr. Goetz had attempted to stop drinking alcohol, and there is some indication that at least on two discrete occasions, he had imbibed alcohol during the pre-existing condition period – in March 2006 and on the accident date. GGL's review of Mr. Goetz's claim does not include any attempt to define "alcoholism" in a specific and quantifiable way. Nor does the company attempt to explain how Mr. Goetz's precise behavior during the pre-existing period fits into the specific definition of "chronic alcoholic." There is no review or analysis of Mr. Goetz's behavior prior to the pre-existing condition period, such as whether and to what extent he received inpatient treatment for alcohol abuse or how many drinks he reported having in a weekly period, that would elucidate the term "chronic alcoholic" as it relates to Plaintiff's personal history. GGL also does not attempt to tie its loose term "alcoholism" to its definition of sickness as "illness or disease."

The record indicates that Mr. Goetz had fallen four times before his subdural hematoma. However, these falls are not explained, nor are the circumstances surrounding his accident revealed in any meaningful way. The record suggests that he had experienced seizures in the past, but does not indicate whether seizures played a role in the falls he had prior to his subdural hematoma. The record also shows that Mr. Goetz was taking anti-coagulants, which are known

to increase the possibility of a subdural hematoma.  *See Vander Pas*, 7 F.Supp.2d at 1013.

Although this court recognizes its duty to defer to GGL's interpretation of its Policy, it perceives that the record supporting Mr. Goetz's chronic alcoholism is vague, scant, and somewhat speculative.  It does not appear that GGL made any attempt to investigate Mr. Goetz's "alcoholic" condition beyond the cursory doctor's notations in the record during the three-month period.  The records do not reveal that Mr. Goetz received inpatient or outpatient treatment for alcoholism during the pre-existing condition period.

GGL further does not explain how notations from Plaintiff's physician concerning Plaintiff's use of alcohol constituted treatment, consultation, care or services or prescribed medication for the subsequent subdural hematoma.  A.R., pp. 170, 313.  Although the doctor's discussions with Plaintiff might have constituted "consultation" for alcoholism, alcoholism is a very different condition from a subdural hematoma.  *See e.g., Pitcher*, 93 F.3d at 412 (finding that fibrocystic breast condition does not necessarily lead to breast cancer).  The Policy states: "A 'pre-existing condition' means a sickness or injury *for which* the insured received medical treatment, consultation, care or services including diagnostic measures, or had taken prescribed drugs or medicines in the three months prior to the insured's effective date."  A.R., p. 170 (emphasis added).  A plain reading of this provision suggests that the pre-existing condition should at least be somewhat foreseeable in that the claimant received some kind of medical attention directly related to the sickness or injury or to a necessary precursor of the sickness or injury at issue.  GGL does not explain how treatment for alcoholism is also treatment for a subdural hematoma or explain the chain of causation any further than to state that Plaintiff's undefined "alcoholism" is the pre-existing condition for his later subdural hematoma.  Further,

although Plaintiff was taking folic acid during the relevant time period, the record does not indicate the precise reason why Plaintiff was on folic acid and whether it was related to his "alcoholism" and how this prescription relates to the subsequent subdural hematoma.

In addition to problems with GGL's analysis of the terms of its own Policy, the court finds that the number of causal steps between a vague and undefined "alcoholism" to a severe disability from a subdural hematoma is troubling. Although the word "contribute" can be viewed quite broadly, in that almost an innumerable amount of factors can play a role in an outcome, the word "contribute" must be construed within the bounds provided by ERISA itself. In reviewing the rules pertaining to pre-existing condition clauses, the court finds Example 5 provided in 29 C.F.R. § 2590.701-3(a)(2) persuasive. Example 5 describes a participant with diabetes who has a number of conditions related to diabetes, including a foot condition, who stumbles and breaks a leg. *Id.* The regulation explains that "the leg fracture is not a condition related to D's diabetes, retinal degeneration, foot condition, or poor circulation, even though they may have contributed to the accident. Therefore, benefits to treat the leg fracture cannot be subject to a preexisting condition exclusion." *Id.* It appears, then, that there is a limit under ERISA to the extent to which the term "contributed to" may be stretched.

The court concludes that this action bears more resemblance to the situation present in *Fought*, *Pitcher*, and *Hardester* rather than the situations present in *Bullwinkel* and *Cash*. Although cases interpreting pre-existing condition clauses are scarce and highly fact-specific, there are a few illuminating guidelines to be gleaned from a review of them. Cases in which courts have found pre-existing conditions to exist include cases in which necessary precursors evolved into more specific diagnoses requiring more aggressive treatment. *See e.g.*, *Bullwinkel*,

-34-

18 F.3d at 433 (lump in breast that was not a "trivial and inconclusive symptom"); *Cash*, 107 F.3d 637 (diverticular disease that later evolved into diverticulitis).

In cases in which pre-existing conditions were determined not to deny eligibility under an ERISA plan, such as *Pitcher* and *Hardester*, the pre-existing condition, in those cases lumps in the claimants' breasts also associated with fibrocystic breast condition, could be something other than breast cancer and were not necessary precursors to breast cancer in those particular patients. In *Fought*, the Tenth Circuit found the staph infection was too removed from the underlying heart condition for which the plaintiff had elective surgery. 379 F.3d at 1009-10. In this case, the court concludes that while undefined "alcoholism" may have made Plaintiff more predisposed to experiencing a subdural hematoma, his subdural hematoma is analogous to the broken leg of the diabetic in the Department of Labor's Example 5. *See* 29 C.F.R. § 2590.701-3(a)(2)(i)(C), Example 5. Like the plaintiff in *Fought*, there are several steps of causation that must be undertaken to arrive at the point of Plaintiff's severe disability in this case. The chain of causation goes something like this: Plaintiff was a recovering or chronic or undefined alcoholic who may have been drinking to some unknown extent during the pre-existing condition period; Plaintiff also took an anticoagulant medication, which could have increased his risk of a subdural hematoma; Plaintiff was on several different types of medication for various ailments at the time of his injury; Plaintiff also had experienced seizures at some point in the past associated with alcohol withdrawal that may or may not have occurred in connection with his injury; Plaintiff fell three different times, striking his head under unexplained circumstances; Plaintiff fell a fourth time under unexplained circumstances with alcohol in his system at that time; after the fourth fall, Plaintiff experienced a traumatic brain injury that has severely disabled him. The

-35-

court concludes that as with the Department of Labor's Example 5, it is possible that Mr. Goetz's history of alcohol consumption "contributed" in some way to his ultimate severe head injury, but it is not a close enough connection to exclude under ERISA's requirements pertaining to pre-existing condition exclusions. *See* 29 C.F.R. § 2590.701-3(a)(2)(i)(C), Example 5. The regulation provides that under the Department of Labor's interpretation of ERISA, ". . . a group health plan, and a health insurance issuer offering group health insurance coverage, may impose, with respect to a participant or beneficiary, a preexisting condition exclusion *only* if the requirements of this paragraph (a)(2) are satisfied." 29 C.F.R. § 2590.701-2(a)(2) (emphasis added). Alcoholism is not a necessary precursor to a subdural hematoma in the way that diverticular disease is to diverticulitis. Thus, this court concludes GGL's decision to deny Mr. Goetz benefits is arbitrary and capricious because it rests on attenuated extensions of contributing factors to injuries that ERISA itself does not permit.

Further, the court concludes that GGL did not undertake a deliberate principled reasoning process by tying a defined condition to the specific terms of its Policy. *Killian*, 152 F.3d at 520. Nor is the decision supported by substantial evidence linking Plaintiff's consultations for alcoholism to medical treatment of the subsequent subdural hematoma under the terms of the Policy. *Id.* For these reasons, the court will **GRANT** Plaintiff's motion for judgment on the pleadings and **DENY** Defendants' motion for judgment on the ERISA administrative record.

### III.     Conclusion

For the reasons stated *supra*, the court will **GRANT** Plaintiff's motion for judgment on the pleadings and **DENY** Defendants' motion for judgment on the ERISA administrative record. In an ERISA case in which the plan administrator's decision was arbitrary and capricious, a

court "may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621.

In *Elliott* the Sixth Circuit adopted a rule regarding ERISA remedies established by the First Circuit in *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1ˢᵗ Cir. 2005). 473 F.3d at 622. The Court noted that

> where "the problem is with the integrity of [the plan's] decision-making process," rather than "that [a claimant] was denied benefits to which he was clearly entitled," the appropriate remedy generally is remand to the plan administrator. We agree with the First Circuit. Such a course is consistent with this court's precedent and we adopt it here.

*Id.* (quoting *Buffonge*, 426 F.3d at 31-32). The Sixth Circuit further noted that in *Buffonge* the First Circuit also held that "courts 'must have considerable discretion to craft a remedy after finding a mistake in the denial of benefits.'" *Elliott*, 473 F.3d at 622 (quoting 426 F.3d at 31-32).

This court has considered the remedy and has determined that Plaintiff was clearly entitled to an award of benefits under GGL's LTD Policy. *See Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 171 (6ᵗʰ Cir. 2007) (finding no need to remand the matter to the administrator because plaintiff was clearly entitled to benefits under the ERISA plan). As in *Cooper*, there is no need to remand this matter to the plan administrator for further consideration. Thus, an award of retroactive benefits and any future benefits to which Plaintiff may be entitled under the terms of the Policy is an appropriate remedy under the circumstances present here. Because the court finds that Defendants' decision to deny Plaintiff LTD benefits based on the Policy's pre-existing condition clause was arbitrary and capricious, and the Defendants have offered no other reason for denying those benefits, the court concludes that an award of benefits is a suitable remedy.

-37-

A separate judgment will enter.


_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE
